## Taylor, et al. v. Citizens Oil Company, et al.

(Decided December 6, 1918.)

### Appeal from Jefferson Circuit Court (Chancery Division No. 2.).

1. Corporations—Capital Stock.—Stock in a corporation, organized under and valid by the laws of a foreign state, must be treated as valid in this state.

2. Corporations—Capital Stock.—Under section 193 Kentucky Constitution, a corporation organized under the laws of this state can not issue its capital stock in payment for property of a market value less than the par of the stock, without subjecting the excess stock so issued to cancellation.

3. Corporations—Capital Stock—Payment.—A Kentucky corporation can not receive the stock of another corporation at par value, in payment for its own stock, unless the assets of the other corporation be equal in market value to the par value of the total capital stock of said corporation.

4. Corporations—Capital Stock—Payment.—One who obtains stock from a Kentucky corporation, without paying full par value therefor, is liable to creditors of the corporation for the difference between the price paid and the par of the stock, under section 547 Kentucky statutes; or, the holder of stock may, at the suit of the corporation, be required to surrender for cancellation all stock in excess of the price paid, under section 568 Kentucky Statutes.

5. Corporations—Capital Stock—Oil Leases.—Where an oil company, organized under the laws of this state, issued its capital stock in payment for oil leases of a much less market value than the face value of the stock so issued, the corporation, or upon its failure a bona fide stockholder therein, may institute and maintain in the corporate name and for its use and benefit, an action in equity for the cancellation of all stock issued by the company in excess of the reasonable market value of the leases given in payment for the stock.

6. Corporations—Capital Stock—Oil Leases.—Stock in a corporation issued under the laws of the state of West Virginia and valid in that state, must be treated as valid by our courts, and stock issued by such corporation in payment for oil leases of a less market value than the par value of the stock, must be upheld and

allowed to participate in the assets of the West Virginia corporation in the same manner and to the same extent as stock issued for full par value in the same corporation; the rule is different with respect to stock issued in a Kentucky corporation.

DODD & DODD and RICHARDS & HARRIS for appellants.

AUGUSTUS E. WILLSON, R. P. DIETZMAN and ABRAHAM SIMMONS for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

The appellee, Citizens Oil Company, capitalized at $725,000.00, was created under the laws of Kentucky by the consolidation of the Hawesville Oil, Gas & Development Company, a West Virginia corporation, with the old Citizens Oil Company, organized under the laws of this Commonwealth. The capitalization of the consolidated company is exactly equal to the combined capital of the two old companies. The articles of incorporation of the two old companies are very similar, and the objects and purposes for which these corporations were organized, as declared therein, are almost, if not precisely, identical. Each of the old companies was engaged more or less in taking and holding oil leases and oil properties, drilling and operating for oil and gas, but chiefly in issuing and selling its capital stock. The Hawesville Company, organized under the laws of West Virginia, is the older. The appellants, Taylor and the two Blakes, were its organizers, chief officers and directors. The first meeting of the stockholders and directors of the company was held in Huntington, West Virginia. At that meeting W. H. Taylor, who was declared to be the owner of about 20,000 acres of oil and gas leases in the western Kentucky oil field, proposed to sell to the Hawesville Company said leases for the consideration of $250,-000, and take that price in the capital stock of the concern. This proposition was duly accepted by the company, and Taylor undertook to transfer the leases to the corporation, and the corporation issued to Taylor and his associates 250,000 shares of its capital stock, par value one dollar each. There remained in the treasury of the company 100,000 shares, par value one dollar each. W. H. Taylor was made president, and the Blakes were each officers in the company. Shortly thereafter they, for the company, opened offices in the city of Louisville, Kentucky, and began to sell stock. The money realized from

the sale of the treasury stock, after paying the salaries of Taylor and the Blakes and a commission to stock salesmen, was partly devoted to drilling wells upon leases held by the company in western Kentucky. Another part of the money was used in purchasing certain property and leases in Illinois. No oil or gas of consequence was found on the leases in western Kentucky, and the work of drilling in that field ceased. About this time Taylor, the two Blakes, and certain associates, entered into a syndicate agreement for the organization and promotion, under the laws of Kentucky, of the Citizens Oil Company, known in this record as the old Citizens Oil Company. It was capitalized at $375,000. Taylor and the other members of the syndicate then owned and held about 30,000 acres of oil and gas leases in the so-called western Kentucky oil field, all in Taylor's name, which Taylor at the first meeting of the stockholders of the Citizens Oil Company in Louisville, proposed to sell to the corporation for $240,000, and take payment in 240,000 shares of the capital stock of the new corporation. This proposition was accepted by the corporation and the stock issued to Taylor and the members of the syndicate owning the leases. The affairs of this company were conducted much as those of the Hawesville company; the treasury stock as well as part of the stock issued to Taylor and his associates was sold on the market. The money received for the treasury stock was partly used in drilling wells, paying salaries and buying other oil leases, among the leases some in Illinois. Some time after the organization of the second company, the officers and directors of the Hawesville Company, and those of the Citizens Oil Company, entered into an agreement of consolidation under sections 555, 555a and 556, Kentucky Statutes, which was carried into execution, by which agreement it was provided: "1. That, in as much as the said parties, corporations, are engaged in the same business, and have like properties, and the same privileges and powers, and their respective properties are represented in value by the par value of the stock of the respective companies, such consolidation shall be effected by the sale, assignment and transfer which is hereby made, of all the lands, leaseholds, or any interest therein, or oil, gas or mineral rights therein, and all machinery and supplies for the operation and development of their respective businesses and all prop-

erty of every kind of each corporation to the consolidated corporation.

"2.   And for this purpose the capital stock of said consolidated corporation shall be equal to the combined capital stock of the corporations, parties hereto, and the said shares of stock of each of said corporations, parties hereto, shall be taken up and in their stead shall be issued to the stockholders of both corporations the number of shares of stock in the consolidated corporation equal to the number of shares held by said stockholders in each of the corporations, parties hereto, share for share.

"3.   It is agreed that such consolidated corporation shall become and be a domestic corporation of the Commonwealth of Kentucky, for all purposes and shall be subject to the jurisdiction of the courts of this state and to all laws of this state relating to corporations organized thereunder." Thus the appellee, Citizens Oil Company, arose upon the ruins of the two old companies. At the time of the consolidation each of the old companies held certain oil and gas leases in western Kentucky, Illinois and Indiana. The value of the leases in western Kentucky was small, and at that time the value of the leases in Illinois field was purely speculative. All of the stockholders of both the old corporations, however, agreed to the consolidation of the two companies, and do not now complain thereof, and were to and did receive as many shares of stock in the new concern as they held in both the old concerns, the par value of the stock being one dollar per share in all three of the companies. Shortly after the consolidation of the two original companies, it was discovered that the leases in Illinois were of considerable value. Several wells were drilled which produced oil in paying quantities. Taylor was the president of the new corporation, the two Blakes, appellant Fetter and others were officers and directors of the company. Things were progressing nicely with the consolidated company when Geiger, a stockholder in both the old concerns and consequently a holder of stock in the new company, instituted this action in the Jefferson circuit court, chancery division, to cancel all stock issued to Taylor and his associates in the new Citizens Oil Company in exchange for a like number of shares in the Hawesville Company and the old Citizens Company, amounting to 490,000 shares, of the par value $490,000.00, upon the

ground that the stock was issued in violation of section 193 of the Kentucky Constitution, which declares that ''No corporation shall issue stock or bonds except for an equivalent in money paid or labor done, or property actually received and applied to the purposes for which the corporation was created, and neither labor nor property shall be received in payment of stock or bonds at a greater value than the market price at the time such labor was done or property delivered, and all fictitious increases of stock or indebtedness shall be void.'' To the same effect is section 568 Kentucky Statutes. It is contended by Geiger and also by certain other stockholders, who afterwards joined as plaintiffs in this action, that the leases in western Kentucky which were transferred by Taylor and his associates to the two companies—20,000 acres to the Hawesville company for which they received 250,000 shares of stock, 30,000 acres to the old Citizens Oil Company for which they received 240,000 shares of stock—were worthless and of no value. (1) Because void and uninforcible contracts, being unilateral, and if not void contracts, (2) they were of no market or other value whatever, being in wildcat territory, and therefore come within the prohibition of section 193 of the Constitution above quoted. In substance the plaintiffs ''charge that defendants, Taylor and the Blakes, conspired together to organize the corporation with the fraudulent purpose of having an immense number of shares of stock issued to themselves for a wholly inadequate if not worthless consideration, by means of which they have taken control of the corporation and are managing it for their own pecuniary benefit, and without regard for the rights of the many *bona fide* holders of stock who have been induced to purchase and pay full value for those shares.'' Issue was joined and a great amount of evidence was taken in the form of depositions, to which was appended one whole volume containing several hundred pages of exhibits, including leases, telegrams, contracts, articles of incorporation and the like.

The chancellor, upon hearing, cancelled all the stock issued by the new Citizens Oil Company to Taylor and his associates in exchange for a like number of shares of stock in the Hawesville Company and the old Citizens Company, which stock in the old companies was issued in payment for the western Kentucky oil leases, and which stock had not passed into the hands of in-

nocent purchasers for value. It was also decreed that
Taylor and the Blakes should refund to the company
certain sums of money received in salary and commis-
sions from the two old companies as well as the new com-
pany, in violation of a by-law of each of said companies,
providing that no salary or commission should be paid to
an officer except upon resolution or order of the board
of directors duly made and entered. All stock issued to
the original organizers and subscribers in excess of the
amount paid by them for it was also cancelled. By this
judgment about 332,000 shares of the capital stock of
the new company owned and held by Taylor, the two
Blakes, Fetter, Geiger and others, were cancelled, and
the holders were directed to surrender same or account
therefor to the company. As the annual election of the
board of directors was approaching the court directed its
receiver, named in the judgment, to take charge of the
affairs of the company, to call the stockholders' meet-
ing to order and to see that no shares of stock cancelled
by the judgment be voted at the election. There were
numerous lesser questions disposed of by the judgment
which it is unnecessary here to mention.

From this judgment Taylor and his associates and
holders of the stock cancelled, appeal, insisting that the
judgment should be reversed, (1) because the court had
no right to disturb or set aside the agreement of stock-
holders in the Hawesville Company by which they ob-
tained stock in the consolidated company, and this con-
tention is based upon the idea that the courts of this
Commonwealth have no power to declare void stock of
a West Virginia corporation which is valid by the laws
of that state; (2) the stock of the old Citizens Oil Com-
pany issued to Taylor and his associates in payment for
the 30,000 acres of oil and gas leases, were not void or
illegal, and the court had no right to cancel the same;
(3) stock in a Kentucky corporation, when issued for
property of less value at its then market price than the
par value of the stock, will not be cancelled at the suit
of a stockholder in the absence of complaint by a credi-
tor; (4) the appellee Geiger and his co-plaintiffs below,
were members of the syndicate which was organized to
purchase from Taylor the 30,000 acres of oil leases in
western Kentucky and turn the same into the old Citi-
zens Oil Company in payment for the 240,000 shares of
its capital stock, and if that act was illegal, it was known

to Geiger and his associates and, therefore, Geiger and his associates did not come into equity with clean hands, and did not come within the protecting equitable doctrine that he who seeks equity must do equity; (5) a court of equity can not, without a prayer for such relief, appoint a receiver to supervise the election of the managing officers of a corporation; and several other less important contentions are included in appellants' bill of complaint.

As the case must be reversed we shall only attempt to consider a few of the chief questions, which we conceive to be involved in the determination of this cause, and in the adjudication of which we have reached the conclusion the chancellor erred. When a clear understanding is reached upon these propositions, the balance of the decree, after ascertaining the facts, is mere detail which can be worked out by the master under the direction of the chancellor.

The appellees insist that there are but two principal questions upon which all the details of the case hang for solution: (1) Did the appellant Taylor and his associates acquire the stock which was cancelled by the lower court without giving any value therefor to the appellee corporation? (2) If so, is its stock void under the Kentucky Statutes and Constitution, and if this be granted, who should institute an action to have relief by the cancellation of the void stock? Appellees affirm each of the foregoing propositions, and assert that a stockholder or the corporation may maintain an action to cancel stock issued by the company without consideration equivalent to its par value. Appellants deny these propositions laid down by appellees, and insist that no action, such as this, for the cancellation of stock can be maintained by a stockholder in the attitude of Geiger and his co-plaintiffs.

Let us consider the two old concerns separately: The Hawesville Company, it must be borne in mind, was organized under the laws of West Virginia. By the laws of that state it could legally and properly receive and accept property in payment for stock without reference to the actual or market value of the property so purchased, in the absence of fraud. The West Virginia law is embodied in the following statute:

Subsection 24, of section 2857, vol. 11, page 1144, West Virginia Code:

"In no case shall stock be sold or disposed of at less than par, except by a vote of three-fourths of all stock of the corporation outstanding at the time the vote is taken, and not then until notice of the intention to present a resolution or motion authorizing the sale of stock below par at a stockholders' meeting, shall first be published for at least two successive weeks in some newspaper of general circulation published in the county wherein the principal office of such corporation may be; or if such principal office be not in this state, then in some newspaper of general circulation published in the capital of this state. But nothing herein contained shall be so construed as to prevent any mining or manufacturing corporation subject to the provisions of this chapter, from issuing stock or bonds, and negotiating the sale of same, for payment of real and personal estate for the use of such corporation, and for its other corporate purposes and business, at such place and upon such terms and conditions as may be agreed upon by the owners and directors or stockholders, of such corporation. And any subscriber to the capital stock of any such mining or manufacturing corporation may pay for the same by the transfer and conveyance to such corporation of real or personal property, or both, proper or necessary for the uses and purposes of the corporation, upon such terms as may be mutually agreed upon. All stock so issued shall be fully paid and not liable to any further call or assessment, and, in absence of actual fraud in the transaction, the valuation of the property so purchased shall be conclusive; but it shall be the duty of the corporation to have its minutes or other permanent records to show with reasonable detail the items of the property in payment of which stock or bonds were so issued. Nothing in this section shall be construed as conflicting with section sixty-eight of chapter fifty-four of the Code.''

The 20,000 acres of oil and gas leases transferred to the Hawesville company by Taylor and his associates for the 250,000 shares of the capital stock of that company was, by the laws of West Virginia, allowable and therefore valid and binding, and the stock so issued was not illegal or void. The shares of stock of the Hawesville Company held by Taylor, et al., were of the same force, validity and value as other shares of that concern. Our court has no jurisdiction to enter into a consideration

of the question of validity of stock in a West Virginia corporation which, by the laws of that state, is valid and binding, unless it contravenes good morals or the announced public policy of this state. As said in Williams' Exr. v. Chamberlain, 123 Ky. 161, '' The liability of the shareholders of this corporation is to be measured and determined by the laws of the state where it was organized. Haldeman v. Ainslie, 82 Ky. 395, 6 Ky. L. R. 397; Lou. Banking Co. v. Tiseman, 94 Ky. 83; 14 Ky. L. R. 705, 21 S. W. 531, 1049, 19 L. R. A. 684, 42 Am. St. Rep. 335.'' Horton v. Sherrill-Russell Lumber Co., 147 Ky. 229; Husband v. Linehan, 168 Ky. 312.

The 250,000 shares of the capital stock of the Hawesville Company issued to Taylor and his associates was, by the consolidation agreement, surrendered in consideration of the issual to the holders a like number of shares in the new concern. It is contended by appellees that even though it be conceded that our courts can not declare the Hawesville stock void, it being a West Virginia corporation, yet under the consolidation agreement the Hawesville was merged with a Kentucky corporation, creating the new Kentucky concern, and as appellants are attempting to take and hold shares in the new Kentucky corporation issued for stock in the Hawesville Company void by our law, and therefore without consideration, the question may be reached by our courts. This contention, however, is not sound. The Hawesville Company owned certain leases in western Kentucky and in Illinois, and it must be presumed all these were of some value, but just what value is not yet determined nor is it important in the consideration of the principle involved. Suffice it to say that the assets of the Hawesville Company at the time and just before the consolidation when that concern lost its identity, were of value. This being so, it follows that the shareholders in the Hawesville Company who were the owners ratably and proportionately of its assets, according to the number of shares held by each, were entitled to participate in said assets. If the assets of the Hawesville Company upon a reasonable valuation were worth less than the par value, or face value of the entire outstanding stock of the company, then the actual value of the stock was relatively less, and in converting the stock of the Hawesville Company into stock of the new Citizens Oil Company, it was necessary to steadfastly maintain the relative valuation

and issue only enough stock in the new corporation at its face value to take up and pay for the assets of the old concern at its actual market instead of its face or par value, as indicated by its outstanding stock. The stock issued by the new Citizens Company in excess of the real market value given therefor, was voidable at the suit of stockholders. To illustrate: If the assets of the Hawesville Company were not worth exceeding $100,000.00 whereas its outstanding capital stock was $350,000.00, then the holders of the $350,000.00 shares in the Hawesville Company were entitled to receive only 100,000 shares in the new Citizens Company, that being the actual market value of the assets turned into the new company. As Taylor, his associates and assignees held 250,000 of the 350,000 shares of the Hawesville corporation, which is five-sevenths of the entire issue, they will be required to suffer a proportionate loss according to the value of the assets of the Hawesville Company, but each holder of a share of the Hawesville Company will be entitled to participate in the assets of the company in the same ratio as every other share of stock in that concern without reference to whether the stock which he holds was issued for leases or promotion purposes or full face value. Likewise will the holders of the stock in the old Citizens Company be required to undergo a like loss in case the assets of the old Citizens Company are not found to be equal to the par value of the outstanding stock. When these shares were transferred in exchange for shares in the new concern, the assets of the two old companies were turned into the new concern, and there passed a consideration which was sufficient to support the contract. We must not lose sight, however, of the constitutional provision, section 193, above referred to, because it has application to the next step which we are to consider. The purpose of that section of the Constitution is well stated in the case of Mayfield Water and Light Co. v. Graves County Bank & Trust Co., 170 Ky. 56. This opinion follows one delivered by Judge Taft in the case of Altenberg v. Grant, 85 Fed. 345. The court there said: "The great abuses which have been perpetrated, and the deceits which have ben practiced upon the public, in the organization of corporations and the issue of stock and bonds, the par value of which has been grossly in excess of the real capital embarked in the busines, are too well known to require comment.

·The framers of this section, and the people who adopted it, proposed to remedy these abuses by a specific requirement that no one should acquire stock or bonds from the corporation without having contributed to the capital, available for carrying on its business, cash or its full equivalent in labor or property equal to the par of the stock or bonds received.'' Obviously a corporation is prohibited from issuing stock except (1) for an equivalent in money paid or (2) labor done, or (3) property actually received and applied to the purpose for which the corporation was created, and labor and property given in exchange for stock can only be received at its market price at the time of the exchange. The market price of the labor or property received and not the price agreed upon between the corporation and the subscriber for stock, controls. As said by Judge Taft in the case of Altenberg v. Grant, *supra,* ''The obvious meaning of the section is that stock and bonds shall only be issued in exchange for work or property when the market price of the labor or property shall be equal to the par value of the bonds or stocks exchanged. It has been contended that the market price referred to in the section is the market price of the stock to be issued, and that, if it appears that the work done or property delivered is equal to this market price, the purpose of the section is fulfilled. This would be to render the section nugatory, and would justify a corporation in issuing stock for nothing, if it appeared to have no value in the market. It would thus defeat the plain intent of the section, which was to make the stock and bonds of a corporation worth their face value.'' Applying this rule, it follows that if an oil and gas lease having a market value of $500.00 be transferred to an oil company in exchange for $5,000.00 par value of stock of said company, the prohibition would be violated and an equitable remedy would arise to the corporation or its *bona fide* stockholders, whereby all stock issued in excess of the market value of the lease could be cancelled. It results, therefore, that the stock of the new Citizens Oil Company, a Kentucky corporation, could not be issued except for money equal to the face value thereof, or labor or property equivalent in value at its market price to the par of the stocks or bonds received. Necessarily we must first go back to the Hawesville Company and ascertain the actual, real market value of the assets of that concern at the time

the same were turned into the new-corporation and stock issued to Taylor, et al., and from such facts determine what price has been paid by Taylor and his associates for the 250,000 shares of the capital stock of the new Citizen Company, issued in exchange for an equal number of shares of the Hawesville Company; and if it be found that the assets of the Hawesville Company were less in market value than the total face value of the outstanding shares of the capital stock of that company at the time of the merger, as seems highly probable, then it follows as a logical sequence that each share of stock of the Hawesville Company was of less value than par and cannot be accepted at face value in payment for shares in the new Kentucky corporation, nor otherwise than to the extent that the shares actually represent value based upon the assets of the old company.

It may now be regarded as the settled law of this state that one who procures a corporation to issue its stock to him without giving to the corporation labor or property equivalent in value to the face of the stock, may at the suit of the corporation, or a stockholder, for its use and benefit, under section 568 Kentucky Statutes, be compelled to surrender for cancellation all stock in excess of the market value so given, or paid, or such stockholder may, at the suit of creditors, under section 547 Kentucky Statutes, be compelled to account for and pay the difference between the amount actually paid for the stock and the par value thereof, this amount to be gathered into the treasury of the corporation for the payment of its debts. Ky. Constitution, sec. 193; Haldeman v. Ainslie, 82 Ky. 395; Baking Co. v. Eiseman, &c., 94 Ky. 83; Ky. Mutual Invest. Co.'s Ass'n v. Schaefer, &c., 120 Ky. 227; Altenberg v. Grant, *supra;* Mayfield Water Co. v. Bank, 170 Ky. 56; Jones v. Bowman, 181 Ky. 722. Section 547 is in aid of creditors of the corporation, while section 568 safeguards the corporation and its *bona fide* stockholders.

When a holder of stock is sued by creditors to recover the unpaid balance on his stock subscription, he cannot then surrender the stock and avoid liability, nor can such holder, when sued by the corporation, elect, in the absence of the concurrence of the company or creditors, to pay the balance between the amount given and the face of the stock and retain the same. His bad faith will not be permitted to work an advantage to him, the

election of remedies being open to those only who come with clean hands.

Where the control of the wronged corporation is in the hands of persons who have obtained stock directly from it, without giving value or who have paid only an insufficient consideration, or whose interests are antagonistic to the company, and therefore will not institute, or allow to be instituted, proceedings in the name of the corporation to redress the wrong and cause a surrender of the stock issued without consideration, a stockholder may institute and maintain such an action for and on behalf of the corporation. P. C. C. & St. L. R. R. Co. v. Dodd, &c., 115 Ky. 176; O'Hara v. Williamstown, &c., 133 Ky. 828.

The holder of stock purchased directly from the company for less than par is in a very different position to one who purchased in good faith from a third person who had acquired the stock from the company, or another, unless such holder was familiar at the time of purchase with the facts and knew that the stock so transferred to him was tainted with fraud or had been issued by the company in payment for property, at a price in excess of the market value thereof. One who in good faith for value purchases stock from a third person, without knowledge that the stock had been obtained from the company without the payment of an equivalent in value to its par, is not subject to the constitutional prohibition, which declares "all fictitious increase of stock shall be void," but one who takes stock from a company in payment for property of less market value than the par of the stock so issued does come within the prohibition, and the part which is in excess of the market value of the thing given in payment therefor, is fictitious and therefore voidable at the suit of the corporation.

There is this distinction between the stockholders in the Hawesville Company and the old Citizens Company; the shares issued in the Hawesville Company for leases, otherwise known as promotion stock, are upon exactly the same basis as the other shares in that concern, and the holders of promotion shares in the Hawesville Company will participate in the new Citizens Company in the same manner as all the other shareholders of the Hawesville Company; but, it is different with the holders of shares in the old Citizens Company for that is a domestic corporation and subject to the laws of this Com-

monwealth. And as the promotion shares issued in that concern to Taylor and his associates was paid for by oil leases in western Kentucky, of less value than the par value of the stock issued in payment therefor, it becomes necessary to know the value of these leases in order to arrive at the correct valuation of the interest of Taylor and his associates in the old Citizens Oil Company. If, for instance, the 30,000 acres of oil leases which Taylor and his associates turned into the old Citizens Company for the $240,000.00 worth of stock were in fact worth only twenty-five cents per acre, or $7,500.00, then Taylor and his associates who received the $240,000.00 would owe the Citizens Company, if allowed to retain the stock, the difference between the amount paid, $7,500.00, and the par value of the stock, $240,000.00, or $232,500.00, and at the suit of creditors, under section 547 Kentucky Statutes, could be compelled to make this discrepancy good, but as Taylor, et al., are not entitled to retain the stock so issued to them, the excess over the market value of the leases transferred to the company, must be cancelled. This suit seeks only к to cancel the stock in excess of the actual market price paid, and after the value of the lease has been fixed and this sum subtracted from the whole the court will cancel all other shares of the promotion stock which were not at the commencement of this action in the hands of innocent purchasers for value. Of course, the shareholder who paid par for his stock in the old Citizens Company is entitled to advantage over the promotion stock, but not to the extent indicated by the judgment of the lower court, for he will take shares in the new company in the ratio that the actual value of the assets of the old company holds to the face value of the stock of said old company. If upon investigation it should be found that the assets of the old Citizens Company, which is capitalized at $375,000.00, were worth only $100,000.00, and the 135,000 shares of treasury stock which were sold for par, and that all the 240,000 shares of promotion stock issued to Taylor and his associates were yet in their hands, then it would be the duty of the chancellor to ascertain the reasonable fair market value at the time of the transfer to the company of the 30,000 acres of oil leases which Taylor and his associates conveyed to the old Citizens Company for the 240,000 shares of its capital stock, and if that should be ascertained to be, say, $10,000.00 at the

time the conveyance of the leases to the company was made and the stock issued, then it would follow that the 135,000 shares of the capital stock held by *bona fide* purchasers, if all are so held, must be added to the ten thousand shares paid for by the $10,000.00 of leases furnished by Taylor and his associates, which would make a total of $145,000.00; and as this sum must be satisfied out of the assets of the company, valued at only $100,000.00, it follows that each share must be reduced to 100/145ths of its par value of one dollar, or aproximately sixty-nine cents.

We conclude therefore, that (1) as the Hawesville Company was a West Virginia corporation and there was no constitutional or statutory regulation prohibiting the issuing of stock by a corporation of that state in payment for property of less value than the face of the stock so issued, that the 250,000 shares, of the capital stock of the Hawesville Company issued Taylor in payment for 20,000 acres of oil and gas leases in Kentucky, though of little value, was valid and could not have been cancelled at the suit of the corporation, a stockholder or creditor; (2) the assets of the Hawesville Company at the date of the consolidation were not of a market value or reasonable value equivalent to the par or face value of the outstanding capital stock of that company, and in consequence was not sufficient consideration under our law to warrant the issual by the new Citizens Company of 350,000 shares of its capital stock of the par value of $350,000.00; (3) in purchasing shares in the new Citizens Company direct from the corporation the subscribers were bound to pay a price in money, labor or property, equivalent, at the market price, to the par value of the stock obtained; (4) the market value of the assets of the Hawesville company must be ascertained as of the date of the consolidation, and when this is done, the value of each share of the outstanding stock of said company will be found by establishing the ratio between the market value of the entire net assets of the company and the total sum of said outstanding capital stock, and this amount, when reduced to units equivalent to shares of stock, whatsoever found to be, will indicate the number of shares of stock to which any given shareholder is entitled, in the new Citizens Company, and all surplus shares should be cancelled, without reference to whether the original stock in the Hawesville Company was issued

in payment for oil leases or otherwise; (5) the rights of the stockholders of the old Citizens Company are very similar to those of the Hawesville Company, with this difference: those who paid full par value for their shares are entitled to participate in the net assets of the old Citizens Company in that proportion which the number of valid shares of the individual holder bears to the whole number of valid shares outstanding, issued for cash, labor or property of a market value equivalent to the par value of the stock, but the shares issued to Taylor, et al., for oil and gas leases, while not absolutely void, are and were invalid in so far as they exceeded in face value the actual market value of the oil leases at the time transferred to the company; (6) the market value of the assets of the old Citizens Company must be ascertained as of the date of the consolidation. Then the reasonable market value of the 30,000 acres of oil and gas leases conveyed to the company by Taylor and associates shall next be ascertained as of the date of sale to the company, and so many of the 240,000 shares of stock issued to Taylor, et al, for said leases as represent, at their face value, the fair market value of said leases, as found, shall be held legal and valid, and the residue shall be cancelled and annulled.

This will reduce the number of outstanding shares materially. The number to which Taylor and associates are found to be entitled—one share for each dollar of market value of leases transferred to the corporation as found as of the date of the sale thereof to the old Citizens Company—added to the number held by purchasers or their assignees for full par value, will represent the total number of legal shares outstanding. With this number of shares in mind and the market value of the assets of the old Citizens Company fixed and determined, it is easy to find a ratio between the two which will be the market value of each share of the old Citizens Company at the time of the consolidation. If this market value is found to be less than par, as appears evident, then the number of shares of each holder must be so reduced as to make the total number, at one dollar each, equal the total net assets of the old Citizens Company, as found. Necessarily the excess stock of each holder must be cancelled in arriving at a just and proper solution. This will eliminate all shares issued without or in

excess of value to the company, and will corresponding-
ly augment the value and importance of each valid share.

Of course, all stock held by Taylor and his associates
or assigns in either of the old companies, or in the con-
solidated company, which was issued by the company in
exchange for money, labor or property equivalent in
value to the par thereof, whether paid by Taylor or
others, was valid and should not have been cancelled, and
if, upon a final hearing, it be determined that either of
appellants held such stock, whether originally issued to
him or not, the same should be held good and allowed to
participate ratably with all other stock of the same
company held by *bona fide* purchasers for par value.

The lower court properly refused to allow Taylor
and the other officers of the three companies to pay
themselves salaries in the absence of an order or resolu-
tion of the board of directors permitting the same, and
there was no error in refusing such officers the commis-
sions claimed on stock sales in violation of the by-laws
of the corporation.

It can not be seriously contended that the share-
holders in either of the corporations who purchased di-
rect from the company for cash, paying less than par,
are entitled to hold or have credit for more stock than
the amount paid would buy at the face value thereof.

As evidence that the leases in western Kentucky
were worthless, appellees point to the record of the con-
solidated company made some months after the dissolu-
tion of the old companies, showing a voluntary surrender
of all leases held in Kentucky for certain reasons. One
was the rentals which would then shortly become due
and which amounted to several thousand dollars. The
leases may not have had a market value as great as the
sum required to pay the annual rentals and yet
have had value. We do not regard the vol-
untary surrender of the leases as a circumstance
of great probative weight in determining the value of the
leases in western Kentucky, because it is common knowl-
edge that leases upon undeveloped lands which have
afterwards proven the best producing territory, have
often been relinquished by companies in like manner and
later taken up and developed and found to be of im-
mense value. The question is, were these leases of value
at the time they were transferred by Taylor to the old
Citizens Company? If so, then Taylor and associates

were entitled to paid up stock in the old company equal at par to the market value of the leases, even though the leases afterwards were voluntarily surrendered.

This opinion proceeds upon the assumption that the chancellor correctly found the facts with reference to the syndicate agreement. This, however, is of little importance, except in determining under which rule they fall. Let it be granted that Geiger, &c., are right in their contention that they did not sign the syndicate agreement, and also accept their further contention that they bought stock in the old Citizens Company instead of leases which were turned into the company in payment for stock, nevertheless they admit they acquired stock from the old company for less than its par value. Consequently, the number of shares held by each must be reduced to that number which the amount paid by them would have purchased at par, and all excess must be cancelled.

Complaint is made by appellants of that part of the decree directing the receiver to attend the annual meeting of stockholders and superintend the election of officers for the company for the ensuing year. In view of the fact that Taylor and his associates held a majority of all the outstanding stock and were in touch with all interested parties and likely able to obtain proxies to be voted at that election, taken with the further fact that these men had from the beginning dominated the affairs of the corporation and its predecessors and perpetuated themselves in office to the detriment of the corporation and other holders of stock, we think the chancellor not only properly named a receiver to take over the affairs and effects of the company, but wisely directed him to attend the stockholders' meeting, call it to order and see that no stock was voted which had been cancelled. The interests of the company and minority stockholders could only be protected by a change of management and elimination of Taylor, Blakes, &c. They had not dealt fairly with the company.

If Geiger, &c., bought stock at fifty cents per share, as they claim, then they are entitled to retain only one-half the shares thus issued to them, but if they purchased an interest in the leases which were transferred to the old Citizens Company for stock, then they were entitled to only enough shares of the capital stock of that company at par to equal the reasonable market value of

their interest in the leases so transferred to the company, and in either case the surplus must be held invalid.

Stock issued to Taylor for leases and afterwards transferred to Emmetsberger, &c., who received the same with knowledge of the infirmity thereof, was invalid to the same extent as if held by Taylor himself.

The conclusion reached by the chancellor with respect to the Wedekind stock is correct and should be enforced when Wedekind is before the court. All other stockholders who have paid less than par for stock obtained direct from the company, and all whose stock is questioned upon any ground, should be brought before the court and their rights determined before final judgment..

The assets of the new company were, at the time of the commencement of this litigation and at the entry of the decree, of considerable value, and the income therefrom amounted to enough not only to take care of its current bills but, under prudent management, to pay a fair dividend on all valid outstanding stock, and yet accumulate a surplus. Its prospects were excellent, and no doubt when this litigation is ended and the company settles down to regular business under the direction of careful and conservative business men, will prove quite profitable to shareholders.

An adherence to the rules and principles above set out, will enable the chancellor, through his commissioner, to easily and quickly work out the multitudinous details and adjust all controversies.

Judgment reversed for proceedings consistent with this opinion.

Whole court sitting.